IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | | |
|---|---|---|
| Mary Ann Catledge, as Personal Representative of the Estate of Scott C. Catledge, Sr., | ) ) ) ) | C/A No. 0:08-1585-CMC |
| Plaintiff, | ) ) | |
| vs. | ) ) | OPINION AND ORDER FINDINGS OF FACT AND |
| Aetna Life Insurance Company, | ) ) | CONCLUSIONS OF LAW |
| Defendant. | ) ) | |
| _____ | ) | |

Through this action, Plaintiff Mary Ann Catledge ("Mrs. Catledge" or "Plaintiff"), acting

as Personal Representative of the estate of her husband, Scott C. Catledge, Sr. ("Scott Catledge" or

"Decedent"), seeks a determination that Defendant Aetna Life Insurance Company ("Aetna"),

abused its discretion when it denied Plaintiff's claim for accidental death benefits following Scott

Catledge's death.

It is undisputed that Scott Catledge died as a result of ingesting ethylene glycol (a chemical

found in products such as antifreeze). What is in dispute is whether his ingestion of this substance

was intentional. Aetna concluded that it was and, based on this factual determination, denied

benefits both because the death was not "accidental" and because the cause of death fell within one

of two exclusions (for self-inflicted injury or death as a result of intentional intoxication). Plaintiff

challenges Aetna's determination of intent as well as its resulting denial of benefits.

The benefits at issue were provided under an employee welfare benefit plan governed by the

Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). Mrs.

Catledge's claims are, therefore, pursued solely under 29 U.S.C. § 1132(a)(1)(B) and (g).

**APPLICABLE LAW AND STANDARD OF REVIEW**

It is undisputed that the underlying Plan grants Aetna discretion to make the relevant coverage decisions. It is also undisputed that Aetna is both the decisionmaker and the insurer of the Plan. Aetna's decision is, therefore, reviewed under an abuse of discretion standard of review with recognition that Aetna operated under a conflict of interest.

As recently clarified by the Fourth Circuit in light of *Metropolitan Life Insur. Co. v. Glenn*, __ U.S. __, 128 S. Ct. 2343 (2008), the presence of a conflict does not change the standard of review from the deferential standard generally applied. *Champion v. Black & Decker*, __ F.3d __, Slip Op. 07-1991 (4th Cir. Dec. 19, 2008). Instead, the conflict is one factor which may act as a tie-breaker when other factors are closely balanced. Slip Op. at 7-8 (quoting *Glenn*, 128 S. Ct. at 2351).

Under the abuse of discretion standard, the court is required to uphold the administrator's decision if it is reasonable, even if the court would have come to a different conclusion had it considered the matter independently. *See Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997). A decision is reasonable if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Id*. at 232 (quoting *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997)).

In deciding whether the decision satisfies this "reasonableness" standard, the court considers the following eight factors:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*See Champion*, Slip. Op. at 9 (quoting *Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare*

2

*Plan,* 201 F.3d 335, 342-43 (4th Cir. 2001)).

## DECISION OF THE COURT

Having fully considered the administrative record before the plan, the memoranda of the parties, and the limited depositions allowed in pursuit of this action, the court enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any findings of fact represent conclusions of law, or vice-versa, they shall be so regarded.

## FINDINGS OF FACT

**A.     RELEVANT PLAN TERMS**

The accidental death benefits sought through this action are provided under the following terms of the Plan.

> This Plan pays a benefit if, while insured, a person suffers a bodily injury caused by an accident; and if, within 365 days after the accident and as a direct result of the injury, he or she loses:
>
> •        His or her life[.]
>
> * * *
>
> Loss of life due to exposure [to] . . . chemical elements will be deemed to be accidental if the exposure was the direct result of an accident.

Dkt. No. 40 at 41. The terms "accident" and "accidental" are not defined in the policy.

The accidental death benefits are subject to a number of limitations. These limitations are listed five pages after the above-quoted basic coverage provision. The intervening pages set out a number of other policy benefits which are also subject to the same list of limitations. The limitations relevant to the present order are as follows:

**Limitations**

This coverage is only for losses caused by accidents. No benefits are payable for a loss caused or contributed to by:

&ast;  &ast;  &ast;

- An intentionally self-inflicted injury.

&ast;  &ast;  &ast;

- Use of alcohol, intoxicants, or drugs, except as prescribed by a physician. An accident in which the blood alcohol level of the operator of the motor vehicle meets or exceeds the level at which intoxication would be presumed under the law of the state where the accident occurred shall be deemed to be caused by the use of alcohol.

Dkt. No. 40 at 46.

## B.    ADMINISTRATIVE RECORD

The documents obtained from the Plan reveal the following facts on which the Plan based its decision. Scott Catledge died on July 25, 2006, following two days of hospitalization during which he was not capable of communication. His death certificate indicates the immediate cause of death as multiple organ failure which, in turn, was caused by ethylene glycol. Dkt. No. 40-2 at 88. In block 43 of this form, which asks the author to "Describe how injury occurred," the coroner typed in "drank anti-freeze." The "manner of death" is listed as "accident." *Id.*

The accidental death determination was apparently made following a police investigation.[1] That investigation is summarized in an "incident report" which reflects an investigation initiated on July 25, 2006, at the request of the coroner. Dkt. No. 40-2 at 89. Although Aetna does not identify the incident report in its denial letters as something on which it relied, it is clear that Aetna did have and consider this document.[2]

---

[1] The relevant block on the death certificate provides six choices: (1) natural; (2) accident; (3) suicide; (4) homicide; (5) pending investigation; and (6) could not be determined. It appears that the coroner initially checked the "pending investigation" block and later indicated that the death was an "accident."

[2] Both of the decisionmakers, whose depositions are summarized below, indicated they considered this document.

4

The incident report states that the coroner was informed by hospital staff that they suspected Scott Catledge "died after ingesting anti-freeze." *Id.* It also indicates that Mrs. Catledge advised the coroner "that her husband was a heavy drinker." Dkt. No. 40-2 at 90.

The report refers to a search of the Catledge home on July 26, 2006, during which time the home was observed to be very poorly kept with multiple full trash receptacles. *Id.* at 90 (also noting that the Catledges were separated at the time although Mrs. Catledge continued to bring food to her husband). A number of bottles of "Code Red Mountain Dew" as well as liquor bottles were collected. *Id.* (the report does not indicate if any liquor remained in the bottles but does state that Decedent was reportedly a heavy drinker who "drank liquor most often mixed with Code Red Mountain Dew").

The report notes that officers found a bottle of antifreeze on the kitchen counter with the childproof seal and some unspecified quantity of liquid missing. It also notes that Decedent's son ("Son") reported that he found the container in his room after his father's hospitalization and moved it to the kitchen counter because he heard medical personnel discussing the possibility that his father had consumed antifreeze. Son also stated that he had seen his father place antifreeze in his truck earlier in the week.[3] Further inquiry of Son was terminated by his mother.

The report also refers to a subsequent "additional interview" and polygraph of Mrs. Catledge on September 5, 2006. The relevant portion of the incident report was initially entered on September 5, 2006 and edited on September 28, 2006. This notation gives very little information regarding the interview beyond stating that Mrs. Catledge "passed the polygraph examination." It

_____

[3] An officer searched for but found no evidence that anti-freeze had been added to the vehicle.

concludes as follows: "These findings were forwarded to Coroner Mike Morris.  Coroner Morris has completed the death certificate in this case with the cause of death listed as an accident."  Dkt. No. 40-2 at 91.

On or about October 12, 2006, Plaintiff submitted a claim through her employer to Aetna for two forms of death benefits: term life insurance in the amount of $2,000; and accidental death benefits in the amount of $50,000.  *See* Dkt. No. 40-2 at 85-86 (interoffice memo form dated October 12, 2006).  The claim was supported by the above referenced death certificate and incident report.[4]

Aetna's computer print-outs indicate it received the claim on or about October 13, 2006. Dkt. No. 40-2 at 7.  The first actions on the claim were taken by employees designated by the initials "ACS," "SJR," and "RAM."   Of these three, only RAM appears to have been involved in any external investigation, which involved several calls to the investigating police officer for the purpose of "verifying that spouse was not implicated in death."  Dkt. No. 40-2 at 7 (10/19/06).[5]  According to Aetna's computer records, it required at least five calls (spaced one to two weeks apart) before RAM was able to speak with the officer on November 30, 2006. *Id* at 7-9.  The investigating officer confirmed what was written on the incident report, that the "spouse was not implicated in [the] death." *Id.* at 9.

A decision to pay the $2,000 term life benefit was made at this time.  *Id.* (entry dated

---

[4]   This report is incorrectly referred to as an "accident report" on the Springs Global interoffice memorandum which forwarded the death benefit claim to Aetna.  Dkt. No. 40-2 at 85.

[5]   At the time these calls were made, Aetna apparently had in its possession the death certificate ruling the death an accident as well as the incident report which concluded with the statement that Mrs. Catledge "passed the polygraph examination."

11/30/06). Shortly thereafter, the claim for accidental death benefits was turned over to Rie Barreto, who is designated in the computer entries as "RZH." *See id.* at 9 (entry dated 12/05/06).[6] Presumably based on the death certificate and incident report, Barreto determined that she would also need to review the autopsy and toxicology reports in order to make a determination. *Id.* at 10 (second entry dated 12/05/06). This information was requested from Mrs. Catledge by letter dated December 5, 2006. *Id.;* & Dkt. No. 40-2 at 83.[7] Mrs. Catledge obtained the requested documents and forwarded them to Aetna on December 16, 2006. Dkt No. 40-2 at 18-37.

The autopsy includes the following clinical summary:

> The decedent was admitted to the hospital two days prior to death with an altered mental status. He had allegedly been separated from his wife. He was to pick up his son and his ex-wife went to the house. She found him in an altered mental status with nausea, vomiting and diarrhea sitting on the toilet. He was transported to Springs Memorial Hospital where he became obtunded and ha[d] to be intubated. He was found to have severe metabolic acidosis. He was markedly hypotensive requiring multiple drugs. A urine drug screen was negative as was Acetaminophen and Salicylates. A search of the house revealed tire cleaner but no antifreeze present. He rapidly deteriorated and died.

Dkt. No. 40-2 at 20.[8]

In a section headed "Final Summary," the autopsy states that Scott Catledge "was admitted

---

[6] As explained under the "supplemental evidence" discussion below, the initials "RZH" refer to Rie Barreto, the reviewer who made the initial decision. *See* Findings of Fact § C.1.; Barreto Depos. at 34.

[7] Barreto's December 5, 2006 letter appears to be Aetna's first request for this additional information, presumably because Aetna only began to consider the accidental death claim after resolving the much smaller claim for life insurance benefits. Both the claim for life insurance and accidental death benefits were, however, received by Aetna nearly two months earlier on or about October 13, 2006.

[8] This summary, while entirely second-hand, is generally consistent with other information presented to Aetna. The notable exception is the reference to the presence of tire cleaner and absence of antifreeze in the home. This statement may raise questions as to whether the container removed from the home was, in fact, antifreeze.

to the hospital two days prior to death with altered mental status," and that he "became markedly hypotensive and died." Dkt. No. 40-2 at 25. It reports that Decedent's "ethylene glycol level was 545 mg/L on hospital admission" but does not indicate any reading for ethanol alcohol level on admission.[9] The Final Summary also states that post-mortem examination revealed "marked congestion" of the kidneys with "[n]umerous calcium oxalate crystals . . . present" which is "consistent with ethylene glycol ingestion" and that "[t]he remainder of the autopsy was unremarkable." The final comments in this summary are as follows:

> Postmortem toxicology revealed negative ethylene glycol and an ethanol alcohol of 31 mg/dL. This was from blood obtained at the autopsy.
>
> The apparent cause of death is acute ethylene glycol ingestion and the manner of death is accidental.
>
> A thorough investigation by the Lancaster County Sheriff's Department and Lancaster County Coroner did not reveal any evidence of foul play. The decedent did have a history of alcohol abuse. No suicide notes were present.

Dkt. No. 40-2 at 25.

The post-mortem toxicology report indicates that no ethylene glycol was found in the blood taken after death. This report does, however, provide the following description of ethylene glycol and its effects:

> Ethylene glycol is a nonvolatile liquid used as an antifreeze, coolant, preservative and glycerine substitute. It also has intoxicating properties similar to ethanol and has therefore been abused for this purpose. The metabolites of ethylene glycol, including oxalate, are toxic and can elicit CNS, cardiopulmonary and renal dysfunction as well as severe metabolic acidosis. Ethylene glycol has not been measured in the blood of normal individuals.

---

[9] The referenced toxicology report (on admission to hospital) includes three pages. One indicating the ethylene glycol reading of 545 mg/L, one indicating an absence of methyl alcohol, and one page the critical line of which is not legible. Dkt. No. 40-2 at 35-37.

> Following ingestion, toxicity of ethylene glycol is manifested in three stages depending on the dose administered. Initially CNS depression is noted with signs including intoxication, coma, convulsions and possibly death. Also during this 1-12 hour post-ingestion period, metabolic acidosis and gastrointestinal disturbances can be noted. The second stage (12-24 hr post-ingestion) is often characterized by cardiopulmonary disturbances including tachycardia, tachypnea and hypertension. In severe ingestions, congestive heart failure and circulatory collapse may be seen. The end stage of ethylene glycol toxicity is renal failure (24-72 hr post ingestion).

Dkt. No. 40-2 at 29.

An excerpt from a treatise was included with the materials sent to Aetna by Mrs. Catledge.[10] This document reflects a July 27, 2006 facsimile transmission from York Pathology and includes the following information on Ethylene Glycol:

> Ethylene Glycol intoxication is one of the most serious and dramatic poisonings encountered in clinical toxicology. As with methanol and isopropanol, ethylene glycol is commonly ingested by debilitated or misguided alcoholic patients, but unlike methanol, ethylene glycol ingestion is sporadic. Intentional administration occasionally leads to poisoning. . . .

> Ethylene glycol is used in many chemical manufacturing processes, as a solvent, as a component of cosmetics, and as an antifreeze solution.

Dkt. No. 40-2 at 31. Later pages of the same document indicate that part of the treatment for ethylene glycol toxicity includes administration of ethyl alcohol. *Id.* at 33.[11]

Aetna's internal computer entries indicate that the above materials were received on December 28, 2006, and that the initial decision to deny benefits was made on that same date. This

---

[10] It appears likely that the treatise excerpt was attached to the toxicology and autopsy reports when they were provided to Mrs. Catledge. This is because both the treatise excerpt and the toxicology report contain a facsimile transmission line indicating the sender as York Pathology and the transmission dates as July 26 and 27, 2006. These dates fall immediately after Decedent's death and months before Mrs. Catledge submitted a claim for benefits. There is, therefore, no apparent basis for Barreto's assumption that these materials resulted from research by Mrs. Catledge. *See infra* Findings of Fact § C.1.

[11] This would appear to explain the presence of ethyl alcohol in Scott Catledge's bloodstream two days after his admission to the hospital.

entry reads as follows: "RCVD AUTOPSY/TOX. DEATH DUE TO USE OF INTOXICANT. EMAIL TO GLS." Dkt. No. 40-2 at 11 (RZH entry). This decision was not, however, communicated to Mrs. Catledge until February 15, 2007, after review by "GHD." *Id.* There is no indication of any review-related activity on this claim in the intervening month and a half.

By letter dated February 15, 2007, Aetna advised Mrs. Catledge of its denial decision. This letter reads, in relevant part, as follows:

> We have completed our review of your claim for AD&PL benefits and have determined that the information received in support of this claim has not established that this loss falls within the AD&PL coverage requirements of the Policy. Accordingly, Dependent AD&PL benefits in the amount of $50,000.00 are not payable to you under the terms of the Policy.

> In order to be entitled to AD&PL benefits under the Policy, certain requirements must be met. These requirements are found under the Accidental Death and Personal Loss Coverage section of the Policy, which states:

>> *This Plan pays a benefit if, while insured, a person suffers a bodily injury caused by an accident; and if, within 365 days after the accident and as a direct result of the injury, he or she loses:*

>> • *His or her life.*

> The Policy that Springs Industries, Inc. purchased for the Plan does not, however, provide coverage for all deaths resulting from bodily injury. As with most insurance, the Policy contains certain restrictions. These requirements are set forth in the Limitations section of the Policy. Under the Limitations section, the Policy states:

>> *This coverage is only for losses caused by accidents. No benefits are payable for a loss caused or contributed to by:*

>> • *An intentionally self-inflicted injury.*

>> • *Use of alcohol, intoxicants, or drugs, except as prescribed by a physician.*

> We based our decision to deny your claim for AD&PL benefits on the requirements of the Policy and all of the documents contained in the claim file, including the following specific information:

10

1. South Carolina Certificate of Death dated July 28, 2006;
2. Proof of Death claim form dated October 12, 2006;
3. Piedmont Medical Center Autopsy Report dated October 17, 2006;
4. National Medical Services Inc[.] Toxicology Report dated September 8, 2006.

According to the South Carolina Certificate of Death, Mr. Catledge's immediate cause of death was multi-organ failure due to Ethylene Glycol *as the result of drinking anti-freeze*. The [autopsy] report indicates that at admission to the hospital a couple of days prior to his death, Mr. Catledge had a blood Ethylene Glycol level of 545 MG/L. The . . . Toxicology Report indicates that Mr. Catledge had a Blood Ethyl Alcohol level of 31 mcg/dL on post-mortem examination.

**The Policy provides benefits for losses caused by accidents. No benefits are payable if the loss was caused or contributed to by an intentionally self-inflicted injury or the use of alcohol/intoxicants. Due to Mr. Catledge's voluntary consumption of antifreeze, he exposed himself to unnecessary risks.** These risks were reasonably foreseeable, and such that he should have known or appreciated the consequences of his intentional acts, including the likelihood or strong possibility of death. Consequently, the loss is not an accident as required by the Policy.

Dkt. No. 40-2 at 45-46 (italics in original, bold emphasis added).

Aetna explained that Plaintiff could seek a review of this decision and encouraged her to submit "any additional information, not previously submitted, which [she] believe[s] will assist [Aetna] in evaluating [the] claim . . . ." The letter stated that the following would be of "particular" assistance: "Written documentation in an official report of the accident, or certified in writing, by the Coroner, that Mr. Catledge's death was an accident and was not caused or contributed [to] by an intentionally self-inflicted injury, alcohol, intoxicants or drugs." *Id.* at 46-47 (indicating claimant should seek review or an extension of the deadline for review within 60 days).

It does not appear that Mrs. Catledge initiated an appeal (or sought an extension to do so) until well after the sixty-day deadline. *See* Dkt. No. 40-2 at 12-13 (computer entries reflecting an absence of activity between February 16, 2007, and December 18, 2007). She did, however, initiate an appeal through counsel in mid-December 2007. *Id.* at 13 (December 20, 2007, entry referencing

11

attorney letter); *Id.* at 44 (attorney letter dated December 14, 2007). In this appeal, counsel states that "Mr. Catledge died as a result of the accidental imposition [sic] of poison. I am enclosing the death certificate in which the cause of death is listed as accidental." The letter states, incorrectly, that "[t]he claim was summarily denied on the ground that the death was a suicide," and threatens to pursue a claim for bad faith refusal to pay benefits if the claim is not paid.[12] The only documentation provided with this letter is "the death certificate in which the cause of death is listed as accidental." *Id.*

Upon receiving this letter, Aetna promptly advised counsel that it could not proceed with the appeal without a signed release from the claimant. Dkt. No. 40-2 at 13.[13] Counsel provided the requested release to Aetna together with a cover letter dated January 11, 2008. Dkt. No. 40-2 at 41-42. The only subsequent communication between Aetna and counsel appears to have been the result of a call from counsel in mid February 2008. This communication is referred to in a February 14, 2008, computer entry stating only that claimant's attorney called on that date and was transferred to "RZH" (Barreto). The computer entry does not indicate what, if any, information Barreto provided to counsel.

A February 25, 2008, letter from counsel to Barreto also refers to this telephonic communication. In this letter, counsel indicates that Barreto advised only that the claim was being reviewed by her supervisor. He expresses frustration that he "ha[s] been unable to get anyone else to call [him] back on this claim and asks Barreto to "[p]lease contact the person reviewing this claim

---

[12] The nature of suit threatened is preempted by ERISA.

[13] Aetna did not object to the appeal as untimely either at this time or any other. Neither did Aetna take any affirmative steps (at this time or upon receipt of the release) to clarify counsel's clearly erroneous belief that the claim had been denied based on a suicide exclusion.

and have them contact me with a decision in regard to the information I sent you indicating this was an accidental death." *Id.*

The decision to deny the claim was apparently made between the time of counsel's call to Barreto and the time his letter was mailed. This is reflected in a computer entry made on February 19, 2008 which reads as follows:

> Appeal decision: Evidence submitted clearly indicates [Decedent] had intentionally consumed antifreeze which contained ethylene glycol, the consumption of which caused his death. There is no indication of a suicide attempt but the policy clearly states the coverage is only for losses caused by accidents: no benefits are payable for loss caused or contributed to by: an intentionally self inflicted injury [or] use of alcohol, intoxicants, or drugs except as prescribed by a physician. Denial is maintained.

Dkt. No. 40-2 at 15 (entry by "HCM").[14] This decision and the final denial letter was then reviewed by "JXB." Dkt. No. 40-2 at 16. The final denial letter was faxed to Mrs. Catledge's attorney roughly three weeks later, on March 5, 2008. Dkt. No. 40-2 at 38. The computer record does not reflect receipt of the attorney's February 25, 2008 letter either before or after issuance of the final denial letter.

The final denial letter quotes the same exclusions as does the initial letter (for losses caused or contributed to by self-inflicted injury and use of intoxicants). It then states that:

> Mr. Catledge's death certificate indicates that his immediate cause of death was multi-organ failure due to ethylene glycol. The official documentation pertaining to Mr. Catledge's death indicates he had a blood ethylene glycol level of 545 mg/L upon admission to the hospital a few days prior to his death *as a result of his*

---

[14] "HCM" refers to Howard Miller who was a trainee working with Jessica Dorazio. Ms. Dorazio, who is identified by the initials JXB, made the final denial decision. *See* Dorazio Depos. at 62-64. In her deposition (discussed below), Dorazio indicated that she clarified her basis of the decision through an entry shown on "page 73" (presumably bates numbered page 3500073 which is filed as Dkt. No. 40-2 at 16 (entry by JXB). That entry states only "Denial upheld on appeal, limitations applicable; letter faxed to atty for bene, scanned to SIR."

*intentional consumption of antifreeze.* Due to Mr. Catledge's voluntary consumption of antifreeze, he exposed himself to risks which were reasonably foreseeable and such that he should have known or appreciated the consequences of his intentional acts, including the likelihood or strong possibility of death. In accordance with the Policy, no benefits are payable for a loss caused or contributed to by an intentionally self-inflicted injury or by the use of intoxicants such as ethylene glycol.

As of this letter, Aetna has not received any information proving that Mr. Catledge's death was not caused or contributed to by his intentional consumption of ethylene glycol, which is an intoxicant. The documents we have on file have been thoroughly reviewed, and the Limitations section of the policy has been examined to determine if the merits of your claim adequately challenge our denial of benefits. Accordingly, we believe, for the reasons stated, that our denial of benefits was appropriate, and we have not received any evidence or reason to indicate that it should be overturned. Therefore, in accordance with the terms of the Policy, Dependent SD&PL benefits are not payable for this loss.

Dkt. No. 40-2 at 38-39. The letter then advises that the decision is final and states that the final decision may be reversed only if found to be arbitrary and capricious.[15] *Id.* at 39 (letter signed by Jessica Dorazio). The specific materials considered are not referenced in this letter, although the letter does refer to the review of all "official documentation." The letter specifically references and quotes only the death certificate.

## C.    Supplemental Evidence

In light of the paucity of evidence as to the basis of Aetna's "intent" determination, and comments in *Glenn* regarding matters which might be considered in weighing the impact of a conflict of interest, this court allowed limited discovery in this matter in the form of two depositions of the key individuals involved in the decisionmaking process. The depositions were further limited as to subject matter.

### 1.    Initial Denial Determination

---

[15] The reference to an "arbitrary and capricious" standard of review is incorrect.

14

The initial claim determination was made by Rie Barreto, a senior life claim analyst who is identified on computer entries as "RZH." Barreto Depos. at 10 & 34-38. In making her decision, Barreto relied primarily but not solely on the autopsy and toxicology reports. *Id.* at 39. She also considered the death certificate and incident report which she read together. *Id*. at 44. Barreto considered the following information from the death certificate to be significant: "the immediate cause [of death], multiorgan failure due to ethylene glycol. And the manner of death is accident, and how injury occurred is marked as drunk antifreeze." *Id.* at 43. Asked if anything on the death certificate suggested Decedent intended to cause himself injury, Barreto responded: "I consider drunk means the person voluntarily take – took antifreeze." *Id.* at 45. She conceded, nonetheless, that there was no express statement on the death certificate that he "voluntarily drank antifreeze." *Id.* Barreto also noted that the death certificate did not say that the ingestion of antifreeze "was like accident[al] ingestion or exposure or anything like that." *Id.* at 46 (but again conceding that the death certificate did not indicate whether the consumption was intentional or accidental). Barreto, likewise, conceded that nothing in the incident report indicated that Decedent "intended to do himself harm" or that he "intentionally drank antifreeze as opposed to accidentally" doing so. *Id.* at 46-47.

Although she conceded that there was no statement in the autopsy report indicating that the ingestion of antifreeze was intentional, Barreto found support for her intent conclusion in the circumstances under which Decedent was found: "[in an altered[16]] mental status with nausea, vomiting and diarrhea and sitting on the toilet" in his home. *Id*. at 48. His failure to "go to the

---

[16]   The transcribed words read "out of mental status," but the referenced text from the autopsy reads "in an altered mental status." In context, the latter appears to be what Barreto intended to say.

hospital right away" caused Barreto to "believe that he didn't take any action" to help himself after the ethylene glycol from the antifreeze took effect. *Id*. at 49. Barreto also considered the autopsy report's indication that there was "no evidence of foul play, so no one forced him to drink antifreeze; so he had to voluntarily drink antifreeze." *Id.* at 59 (later answering "yes" to the question "[Y]ou surmised in reviewing this claim, because there was no evidence that somebody forced him to drink it, you surmise that he must have done it voluntarily"). *See also id.* at 61(explaining that she concluded the ingestion was intentional based on "the fact that the coroner determined that he drunk [sic] antifreeze versus he accidentally ingested it and the fact that there was no foul play; and he had [a] high amount of antifreeze in his system"); *id.* at 70 (stating that she gave particular significance to the word "drank" because "[f]rom my experience, usually [if] the person accidentally ingested something, usually they say accident or ingestion, exposure or accidental overdose; so the drink – drunk antifreeze is pretty specific to me.").

Barreto may also have given some weight to the presence of ethyl alcohol in Decedent's system as reflected in the autopsy report. *See Id.* at 50 (stating significance of presence of 31 miligrams of ethyl alcohol is that "[i]t's above [the] state legal limit of 0.08." *Id.* Nonetheless, she conceded that this measurement was taken after Decedent had been in the hospital for two days. *Id.* (also relying on this time gap in explaining why the autopsy toxicology report did not reflect the presence of ethylene glycol in Decedent's blood).[17]

Barreto also noted that the record included an excerpt from a reference or textbook relating to ethylene glycol, although she did not state that she considered it. Barreto's understanding of the source of this document is, however, somewhat curious as she indicated a belief that these materials

---

[17] Reference materials in the record indicate that ethyl alcohol is used in the treatment of ethylene glycol poisoning. This would explain why this form of alcohol was present in Decedent's bloodstream two days after his admission to the hospital.

were the result of research by Mrs. Catledge. *Id.* at 51. This assumption, while probably not critical, is unsupported. *See supra* n. 10.

Barreto also considered the toxicology report which addressed the presence of ethylene glycol in Decedent's system at the time of his hospital admission. *Id.* at 52. This report reflected a level of 545 milligrams per liter. *Id.* She considered this a "high" level because a normal reading should be zero. She did not, however, consult with anyone to determine any further significance of this "high" level. *Id.* at 52-53.[18]

Barreto also conceded that she did not know whether Decedent had any other alcoholic beverages available to him on the day he ingested antifreeze. *Id.* at 63. She also took no steps to determine the extent of Decedent's history of alcohol abuse. *Id.* Nonetheless, she considered Decedent's history of alcohol abuse in connection with the reference materials which had been included with the documents submitted by Mrs. Catledge because the latter indicated "that people [with] alcohol problem[s] tend to drink antifreeze." *Id.* at 71.

Although Barreto only referred to use of intoxicant as the denial reason on her initial computer entry, she testified that her initial conclusion was that the "death was due to use of intoxicant and also intentionally self-inflicted injury." *Id.* at 49. Barreto made these initial determinations on December 28, 2006. *Id*. at 38. The actual denial letter, which Barreto signed, was sent out on or about February 15, 2007. *Id.* As noted above, although this letter references only the death certificate, proof of death form, autopsy report and the September 8, 2006 toxicology report,

_____

[18] In other words, although she relied on the "high" level of ethylene glycol in Decedent's bloodstream as evidence that he consumed the substance intentionally, Barreto did not seek to determine what quantity of antifreeze Decedent would have had to consume to produce this reading.

Barreto testified that she also considered the incident report and reference materials included in the documents submitted by Mrs. Catledge, as well as a reference book maintained in her office titled "Disposition of Toxic Drugs & Chemicals in Man." Barreto did not, however, indicate what information was gained from this book. *Id.* at 58.

Barreto received the appeal letter on December 20, 2007, almost a year after making her initial decision and over ten months after the denial letter was posted. *Id.* at 38. She did not act on the appeal other than to forward it to Jessica Dorazio, a consultant who was not involved in the earlier determination. *Id.* at 40.

**2.     Final Denial Determination**

Plaintiff's appeal was considered by Jessica Dorazio who, ultimately, made the final denial decision. Dorazio Depos. at 64 & 81. The rationale for the final denial is reflected in the combination of notes made by a trainee working with Dorazio (notes dated February 19, 2008) and Dorazio's additional notation on March 5, 2008, both of which are quoted above. *See supra* p. 13.

When asked on what basis she concluded "the record . . . shows clearly that this decedent intentionally consumed" antifreeze, Dorazio identified the death certificate's reference to "drank anti-freeze." Dorazio Depos. at 65. She conceded, however, that the form does not state that the decedent *intentionally* drank antifreeze.

Although not mentioned in Aetna's initial or final denial letters, Dorazio, like Barreto, also testified that she relied on the incident report. Dorazio found it significant that this report stated that Decedent was a heavy drinker and that he "died after ingesting antifreeze." Dorazio Depos. at 67. She "interpret[ed] this to mean that he intentionally ingested it because there is no evidence to the contrary." *Id.*

Dorazio also relied on similar statements in the autopsy report that the death was due to

ethylene glycol ingestion and that decedent had a history of alcohol abuse. *Id.* at 69. Asked "where in this autopsy report is there clear evidence that [decedent] intentionally consumed antifreeze?" Dorazio responded: "It doesn't specifically say. Again, that's our interpretation." *Id.*

Dorazio did not rely on any other evidence of intent. *Id.* at 72 (confirming she considered only "the autopsy report, the incident report, and the death certificate"). She did, however, consider the toxicology report as supporting the cause of death. *Id.* at 84.

Dorazio conceded that she was not aware of any attempt by Aetna representatives to interview Mrs. Catledge or her son. Dorazio Depos. at 89. She was also unaware of any information Mrs. Catledge may have given during her police interview. *Id.* Dorazio noted, nonetheless, that Mrs. Catledge was given an opportunity to submit an explanation, which could have included a personal narrative. *Id.* at 99 (stating on cross-examination that "[t]here are no limits on the type of documentation that someone can submit").[19]

---

[19] Prior to making its initial denial decision, Aetna made one request for additional information from Mrs. Catledge. This was in the form of a December 5, 2006, letter asking specifically for the autopsy and toxicology report. This letter did not invite Mrs. Catledge to provide any other information.

Aetna's next communication to Plaintiff was its initial denial letter. This letter advised Plaintiff as follows:

> If you have any additional information, not previously submitted, which you believe will assist us in evaluating your claim . . . please forward that to us . . . . *In particular, the following information would assist us in evaluating your claim for benefits and could affect our benefits determination: 1. Written documentation in an official report of the accident, or certified in writing, by the Coroner, that Mr. Catledge's death was an accident and was not caused or contributed [to] by an intentionally self-inflicted injury, alcohol, intoxicants or drugs.*"

Dkt No. 40-2 at 46-47 (emphasis added). After advising Mrs. Catledge of her ERISA appeal rights, the letter repeats that Aetna will consider

> any additional evidence you submit, including but not limited to:
> • The specific information listed above, and
> • Any other claim information or documentation you believe would assist us in reviewing your claim.

Dorazio also testified on cross-examination that Scott Catledge's history of alcoholism was significant because "[b]ased on the documentation it was known that people who had a drinking problem could consume antifreeze as a way of getting intoxicated." Dorazio Depos. at 100. On redirect, she conceded that she had no information regarding "whether there were any normal alcoholic drinks available to [Decedent] at the time . . . he ingested antifreeze." *Id.* at 105. She also conceded that Aetna did not explore the extent of Decedent's history of alcoholism, relying only on the references in the documents provided (autopsy and incident report).

## CONCLUSIONS OF LAW

**A.     Issues for Review**

The issues for review are whether Aetna abused its discretion in deciding the following two questions adversely to Plaintiff: (1) whether Decedent died as a result of an accident; and (2) if so, whether the cause of the accident fell within a Plan limitation (*i.e.* whether the accidental death resulted from intentional self-harm or use of an intoxicant). Aetna provided a single answer to the combined questions, concluding that the death was not accidental because it resulted from an excluded cause. Thus, albeit through a single answer, Aetna answered the first question "no" and the second question "yes."

As discussed below, the two questions should have been addressed separately, given the allocation of the burdens of proof. This is particularly important where, as here, the burden of proof may be determinative because of the limited underlying evidence. That said, the single answer recognizes that the first and second questions are closely intertwined. Whether the death was

---

*Id.*

Fairly read, these instructions allow for but do not encourage submission of a personal narrative. They further suggest that Aetna is likely to be persuaded only by an official determination of Decedent's intent that is directly contrary to Aetna's application of the policy exclusions.

accidental and whether one of the two cited exclusions applies turns on a single underlying determination: whether Decedent *intentionally* consumed anitfreeze or some other substance containing etylene glycol.[20]

## B.     Burdens and Standards of Proof

An individual claiming benefits under an ERISA plan bears the initial burden of establishing that the claim falls within the scope of coverage. *Jenkins v. Montgomery Industries*, 77 F.3d 740, 743 (4th Cir. 1996) (importing common law as to burdens of proof from state law). If the claimant satisfies this burden, the burden shifts to the Plan to show that some exclusion applies which precludes payment of benefits. *Id.* In the present case, Plaintiff had the burden of showing the death was "accidental" (a term not defined in the Plan). If Plaintiff met that burden, Defendant had the buren of showing that the death resulted from an excluded cause (fell within a Plan limitation).

The court considers this allocation of the burden of proof when conducting a review of the decision of a plan fiduciary, although it must do so in light of the degree of discretion under which the fiduciary acted. As discussed above, Aetna's determination as to whether the claim fell within the basic coverage of the plan and whether it was excluded is subject to review for abuse of discretion. That review requires consideration of the *Booth* factors of which conflict of interest is one consideration but does not modify the standard of review. *See Champion*, Slip. Op. at 9 (factors quoted in full above).

The court finds the following five *Booth* factors to be particularly significant to determining

---

[20] The death certificate refers specifically to antifreeze as the source of the ethylene glycol which led to Decedent's death. The incident report, likewise, indicates that a bottle of antifreeze was found in the kitchen of Decedent's home (but, apparently, moved to the kitchen by Son who found the bottle in his bedroom). The autopsy report, by contrast, states that no antifreeze was found. It suggests tire cleaner as the source of the ethylene glycol.

whether Aetna has abused its discretion in this action:

> (1) the language of the plan; . . . (3) the adequacy of the materials considered to make the decision and the degree to which they support it; . . . (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; . . . and (8) the fiduciary's motives and any conflict of interest it may have.

*Id.*

## C.    Intent

**Importance of issue of intent.**  In the present case, the two questions before Aetna, whether the death fell within the scope of the policy (that is, whether the death was accidental) and whether the cause of death fell within a limitation are closely linked.  This is because both questions turn on whether Decedent *intended* to consume antifreeze.  If Aetna properly concluded that Decedent intended to consume a toxic substance, then it could reasonably conclude that the death was not "accidental" as that term is generally understood.  *See generally Wickman v. Northwestern National Ins. Co.,* 908 F.2d 1077, 1084 (1st Cir. 1990) (holding that, where there is no subjective evidence of intent, insurer may consider whether "a reasonable person with background and characteristics similar to the insured would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct" ) (cited with approval in *Eckelberry v. Reliastar Life Ins. Co.*, 469 F.3d 340, 343 (4th Cir. 2006)).  Likewise, Aetna could reasonably find that the purpose of any intentional consumption of antifreeze was *either* as an intoxicant *or* to cause self injury.[21]

The interrelationship of the two determinations makes application of the differing burdens

---

[21]   The court assumes for present purposes that an ERISA fiduciary might reasonably conclude that a person who intentionally consumed antifreeze did so *either* for the purpose of becoming intoxicated *or* for the purpose of self-harm.  The conclusion that *both* purposes were intended seems less probable.

22

of proof both critical and challenging where, as discussed below, there is minimal evidence as to whether Decedent intended to consume antifreeze. A conclusion as to this intent is a necessary prerequisite to applying the *Wickman* analysis discussed above.[22]

**Evidence of Intent.** The difficulty in this case is that there is no direct evidence and very little indirect evidence as to whether Decedent intentionally consumed antifreeze. What evidence exists in the record shows only that the police and coroner found insufficient evidence to support a finding of foul play (*i.e.* that Decedent was forced or tricked into drinking the toxic substance) or suicide (that he intentionally drank the substance for the purpose of causing his own death). This leaves three possibilities: that the toxic substance was consumed accidentally, that it was consumed for the purpose of self-harm, or that it was consumed as an intoxicant.

**Accidental Consumption.** Aetna summarily dismissed the possibility of accidental consumption, concluding that the absence of evidence of suicide or foul play "clearly" supported a finding of intentional consumption. This rejection is not logical. Rather, absent some other evidence, the elimination of foul play and suicide left the three aforementioned causes equally likely. That is, without something more, there is no basis on which to determine that accidental consumption was less likely than intentional self-harm or use as an intoxicant.

The statement that the accident happened because Decedent "drank antifreeze," fails to favor either accident or intentional ingestion. The question is not whether Decedent "drank" antifreeze but whether he did so knowing he was consuming antifreeze or, instead, picked up and drank from

---

[22] *Wickman* presupposes proof that the insured intended to take the risky action and considers only whether, assuming such intentional risky action, the insured "would have viewed the injury as highly likely to occur." Thus, *Wickman* does not aid in determining the central underlying issue of whether Decedent intended to consume antifreeze.

a cup he believed to contain some other substance. The court finds no basis for Barreto's claim (through deposition testimony) that the coroner's choice of the word "drank" rather than "ingested" or "exposure" indicates a finding by the coroner that Decedent intentionally consumed antifreeze.

At the same time, the coroner's determination that the death was "accidental" is not determinative of whether the death is an "accidental" death as that term is intended in the policy. *See Thomas v. Reliance Standard Life Ins. Co.,* 487 F. Supp. 2d 697, 702 n.3 (D.S.C. 2007) (determination that death was "accidental" as shown on death certificate "does not determine whether the death was an 'accident' for purposes of an accidental death policy, and a coroner's report or similar finding does not bind a plan administrator's examination of the evidence").[23] This is because, even absent a Plan definition, that determination may be subject to considerations such as those addressed in *Wickman*. In any event, the available choices on the death certificate indicate only that the coroner ruled out foul play or suicide as causes.

**Intentional Self-Harm.** Aetna has offered no evidence that Decedent intended self-harm. This is simply an alternative explanation to consumption of antifreeze as an intoxicant if you *first* assume intentional consumption.[24] An intent of self-harm is, moreover, at least somewhat inconsistent with the Coroner's determination that the death was not a suicide. It is also arguably inconsistent with legal presumptions absent evidence to the contrary. *See Clements v. Metropolitan*

---

[23] Of course, in this case the Plan wants to *rely* on a specific adverse inference (intentional consumption) which may be drawn from selected language on the death certificate (that Decedent "drank" antifreeze) while rejecting the determination that the death was "accidental."

[24] Barreto mentioned only the intoxicant exclusion in her initial computer entry. This may suggest that the self-harm exclusion included in the denial letter was an afterthought intended to cover what she assumed was the only logical alternative reason for consuming antifreeze (given her assumption that the consumption of the antifreeze was intentional).

*Life Ins. Col,* 224 S.E.2d 309 (S.C. 1976) (recognizing that "many decisions" of the South Carolina

Supreme Court discuss "the presumption against suicide"); *White v. North Carolina Mut. Life Ins.*

*Co.,* 37 S.E.2d 505 (S.C. 1946) (applying presumption in favor of accident where death is due to

"unexplained violent external means").

      **Use of an Intoxicant.** As to Decedent's possible consumption of antifreeze as an intoxicant,

Aetna relies on evidence that: (1) Decedent was a heavy drinker; (2) alcoholics have been known

to consume antifreeze as an intoxicant; and (3) the pathologist saw fit to mention Decedent's alcohol

use in the autopsy report. All this together suggests only that there was a possible motive for

consumption of antifreeze as an intoxicant and the pathologist may have considered this possible

motive. This is not enough to support a determination that Decedent acted based on such a

motivation because it amounts to nothing more than speculation based on the (presumed) speculation

of others. At the least, Aetna would need *some* other evidence making intentional consumption

more likely than not. Such evidence might include evidence of prior similar behavior (consumption

of a similar product for a similar purpose) or evidence that Decedent had no other alcohol available

to him and his difficulties with alcohol were sufficiently severe that he might have resorted to such

extreme measures in that circumstance. Evidence making accidental consumption less likely as a

probability might also suffice.[25]

      **Decision without sufficient evidence or investigation.** Neither Barreto nor Dorizo

acknowledged the absence or inadequacy of the evidence relating to intent or, at the least, the

difficulty of the question. Instead, both jumped easily and quickly to a decision which saved a

---

[25] In its memorandum, Aetna suggests that other facts may support its conclusion that the death was not accidental such as the color of the antifreeze (which Aetna states was green) versus the color of Decedent's drink of choice (Code Red Mountain Dew). The record does not, however, include any evidence as to the color of the antifreeze in the container found in the home. Neither is there any evidence that either decisionmaker considered the possible color difference.

substantial sum of money for their employer in spite of an inconclusive record.[26]   Both also

characterized the intent issue as "clear" despite the absence or inadequacy of the evidence.[27]   Neither

considered seeking additional evidence which might have clarified the issue of intent before making

their decisions.   For example, neither sought to determine: (1) whether Decedent had any other

alcohol available to him (which would make his consumption of antifreeze as an intoxicant

unlikely); (2) the extent of Decedent's history of alcohol use or abuse (including whether he had

ever before consumed a substance such as antifreeze as an intoxicant or for the purpose of self

harm); (3) the quantity of antifreeze which Decedent would need to have consumed to produce the

level of ethylene glycol found in his system; (4) whether this amount was consistent with the amount

missing from the container located in Decedent's home; (5) whether the statement in the autopsy

report that police found tire cleaner but not antifreeze in the home indicated that the incident report

was in error and, if so, the significance of this error; or  (6) the color of the product removed from

the home (be it antifreeze or tire cleaner).

Much of this information would likely have been available at the time of Aetna's initial

decision, either in more detailed police reports or through interviews of the officers involved.   Some

might have been obtained from Mrs. Catledge through a request for additional information (just as

---

[26]  That said, the court finds no evidence of systematic bias in Aetna's compensation system which, according to the evidence before the court, rewards accuracy rather than benefit denials or other cost savings for the corporation.

[27]  Barreto may also have relied on totally irrelevant evidence in concluding that death was due to use of an intoxicant. In the initial denial letter, Barreto referred to Decedent's blood alcohol level *at the time of death*.   In her deposition, she explained that this level was significant because it was higher than the legal limit (for drivers).   Both the reference and the explanation are troubling as they suggest that she relied on Decedent's blood alcohol level in deciding his death was due to use of an intoxicant.   Decedent was, however, in the hospital in a totally incapacitated state for two days before his death.   Any alcohol in his system at the time of death was, therefore, administered during the hospitalization, presumably as a treatment for etylene glycol poisoning as suggested in the treatise excerpt found in the administrative record.

Aetna had requested additional information in the form of the autopsy and toxicology reports). Unfortunately, Aetna made no effort to obtain this information before making its initial denial decision.[28]

Neither did Aetna suggest to Plaintiff that more information might be helpful *before* the decision was made. The only suggestion that more information was necessary or would be considered was in the form of the initial denial letter which arguably implied that only an official report reaching a conclusion favorable to Plaintiff (including ruling out the excluded causes) would suffice.

When Plaintiff did appeal through counsel, Aetna made no effort to clarify counsel's erroneous belief as to the basis of the denial. Neither does Aetna appear to have been responsive to counsel's telephonic inquiries. Aetna may, in the normal course, have no affirmative duty to assist a participant in perfecting an appeal. However, its failure in this instance to clarify so glaring an error by appellant in the face of so limited a record favoring the Plan's denial, suggests that its interest was more in favor of affirming denial of a claim than in providing a full and fair review of that denial.

**Errors in appeal to Plan.** Plaintiff is not, however, without fault because she failed to seek a timely appeal (although that failure has been waived), and failed to submit any additional information when she did appeal. Indeed, the attorney who represented her in her appeal of the initial denial (not her present counsel): (1) was apparently unaware of the governing law (threatening

---

[28] Aetna's reluctance to seek additional information regarding the police investigation (and items found in the search) before denying the claim for $50,000 in accidental death benefits seems inconsistent with its multiple calls, before paying out the $2,000 life insurance benefit, to confirm that Mrs. Catledge was not implicated in Decedent's death. Notably, these calls were made even though Aetna had in hand a death certificate which ruled out foul play and an incident report which indicated that Mrs. Catledge had agreed to and passed a polygraph examination. Neither Barreto nor Dorizo were, however, involved in making these calls.

a state law bad faith claim) and, consequently, of ERISA's requirements regarding review and appeal; (2) clearly misunderstood the basis of the denial (referring to denial based on a suicide exclusion) and, consequently, misdirected his argument on appeal; (3) did not seek to determine what information Aetna had considered in the initial denial or inquire as to what additional information might be helpful; and (4) relied exclusively on the death certificate's determination that the death was an "accident" rather than a "suicide."[29]

### D.    Application of *Booth* Factors.

While the court cannot excuse the obvious deficiencies in the appeal, neither can it conclude that Aetna's initial decision and review on appeal are consistent with proper exercise of its fiduciary duties. Specifically, the court finds that both the initial and appellate decisions were made without proper consideration of the plan's structure and language (first *Booth* factor). That structure and language establish that the basic scope of coverage is dependent on the claim coming within a common law understanding of the undefined terms "accident" or "accidental." Because the two limitations for death due to intoxication or self inflicted injury appear later in the Plan and after the granting of various other benefits, it would be unreasonable to read the Plan to define accident by reference to the various limitations. Consequently, Aetna should not have conflated the two distinct questions of coverage which, effectively, shifted the burden to Plaintiff to *disprove* application of a limitation.

Aetna also based its decision as to the critical issue of intent on an inadequate factual record (third *Booth* factor). While the court assumes that the issue of intent could not then and cannot now

---

[29] Collectively, these facts suggest that the attorney who handled the administrative appeal either did not have or did not review the initial denial letter. Assuming he did not have the letter and could not obtain it from his client, he should have sought a copy from Aetna so that the appeal might be properly directed.

be conclusively determined, that does not mean that Aetna could act on a clearly inadequate record when more information was likely then available. The difficulties with the initial decision were exacerbated by the suggestion in the denial letter that Mrs. Catledge might need some form of an amended official report to advance her claim and by Aetna's failure to make any effort, once a belated appeal was allowed, to insure that the appeal was meaningful.  Instead, Aetna reaffirmed its initial decision without correcting counsel's misunderstanding of the reason for the denial.[30]

The court also finds that the denial resulted from a decisionmaking process which was not reasoned and principled in that the decision makers based their decision on speculation (fifth *Booth* factor).

For these same reasons, the court concludes that Aetna's denial of benefits did not satisfy "the procedural and substantive requirements of ERISA" (sixth *Booth* factor) because Aetna made its decision without adequate information and failed to provide a meaningful administrative review.

Finally, the court has considered "the fiduciary's motives and any conflict of interest it may have."  Here, as explained in *Glenn* and *Champion*, the fiduciary is operating under a conflict of interest in that a decision in favor of claimant would result in payment of $50,000 from Aetna's assets.  Given the closeness of the question, this conflict tips the balance in favor of claimant.  This is not to suggest that the conflict required Aetna to find in favor of payment when faced with such an ambiguous record.  Rather, the conflict supports placing an affirmative duty on Aetna to seek to clarify the ambiguous record *prior to making a decision* on the intertwined questions of whether Decedent died as a result of an "accident" and whether the "accident" resulted from an excluded

---

[30]  The court does not suggest that an ERISA fiduciary necessarily errs in failing to assist a participant in correcting deficiencies in the form and focus of his or her appeal.  Rather, the court concludes only that an ERISA fiduciary should not be allowed to rely on deficiencies in the form or content of an appeal to excuse its own failure to obtain an adequate record *prior to making its initial or final decision on the matter*.

cause. By failing to seek clarification before making its decisions, Aetna has acted as one interested in denying a claim, rather than as one interested in determining whether the claim should or should not be paid.

## E.     Remedy

Having concluded that Aetna improperly denied the claim, the court, nonetheless, does not find the record adequate to support payment of benefits. This is because *any* decision as to Decedent's intent would be speculative based on the present record. The court, therefore, remands the matter to Aetna for further review by an individual not involved in the earlier review process.

Plaintiff shall be allowed sixty days to submit materials which might aid in resolving open issues including but not limited to the extent of Decedent's difficulties with alcohol, whether he had other alcohol available in the home at the time he apparently consumed antifreeze, and any other matter which might reflect on his intent.

Aetna shall also be allowed to seek additional information within this sixty day period. If it locates additional information, it shall provide that information to Plaintiff and allow her a fifteen day period in which to respond before any decision is made. As an ERISA fiduciary, Aetna is, of course, obligated not only to seek evidence to support its earlier denial, but to seek any evidence which might clarify the record.

Absent further order, Aetna should complete its review within thirty days of Plaintiff advising it that she has submitted all evidence or response which she intends to submit. The parties shall file a copy of that decision with the court within seven calendar days of receipt. As appropriate, the parties may file renewed memoranda in support of judgment within fifteen days of filing of the decision on remand.

## F.     Attorneys' Fees

The court declines to address whether to award attorneys' fees in either party's favor at the present time.

## CONCLUSION

For the reasons set forth above, the court concludes that Aetna abused its discretion in denying the claim for accidental death benefits on the record before it. The court further concludes that the record in favor of Plaintiff is not so strong as to mandate an award of benefits. The court, therefore, remands for further review under the schedule set forth above.

IT IS SO ORDERED.

<u>S/ Cameron McGowan Currie</u>
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
January 21, 2009